IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BROOKE SHARLENE KILBANE,

        Plaintiff,

        v.

NANCY A. BERRYHILL,
Acting Commissioner of the Social Security
Administration,

        Defendant.

Civ. No. 6:16-cv-00538-MC

OPINION AND ORDER

_____

MCSHANE, Judge:

        Plaintiff Brooke Kilbane brings this action for judicial review of the Commissioner's

decision denying her application for supplemental security income ("SSI") and disability

insurance benefits ("DIB"). This court has jurisdiction under 42 U.S.C. §§ 405(g) and

1383(c)(3). On September 12, 2012, Kilbane filed an application for SSI and DBI, alleging

disability as of August 27, 2012. After a hearing, the administrative law judge ("ALJ")

determined Kilbane was not disabled under the Social Security Act from August 27, 2012

through January 21, 2015. Tr. 24.[1]

        Kilbane argues the ALJ made numerous legal errors. As discussed below, the ALJ erred

in assigning little or no weight to the only relevant treating medical opinions in the record.

Accorded proper weight, those opinions, along with the testimony of the vocational expert

---

[1] "Tr" refers to the Transcript of Social Security Administrative Record provided by the Commissioner.

("VE"), demonstrate Kilbane is disabled under the Act. Therefore, the Commissioner's decision is REVERSED and this matter is REMANDED for an award of benefits.

## STANDARD OF REVIEW

The reviewing court shall affirm the Commissioner's decision if the decision is based on proper legal standards and the legal findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012) (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). To determine whether substantial evidence exists, we review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion. *Davis v. Heckler*, 868 F.2d 323, 326 (9th Cir. 1989). "If the evidence can reasonably support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner." *Gutierrez v. Comm'r of Soc. Sec. Admin.*, 740 F.3d 519, 523 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996)).

## DISCUSSION

The Social Security Administration utilizes a five-step sequential evaluation to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520 & 416.920 (2012). The initial burden of proof rests upon the claimant to meet the first four steps. If the claimant satisfies his burden with respect to the first four steps, the burden shifts to the Commissioner for step five. 20 C.F.R. § 404.1520. At step five, the Commissioner must show that the claimant is capable of making an adjustment to other work after considering the claimant's residual functional capacity (RFC), age, education, and work experience. *Id.* If the Commissioner fails to meet this burden, then the

claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v); 416.920(a)(4)(v). If, however, the Commissioner proves that the claimant is able to perform other work existing in significant numbers in the national economy, the claimant is not disabled. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001).

Here the ALJ determined Kilbane could perform light work. Tr. 16-17. The critical question here is whether Kilbane would have to: miss more than four days of work per month due to her ailments; or routinely elevate or rest her feet during the workday? On both issues, only two treating physicians offered an opinion. Both unequivocally answered "yes" to both questions. The only contradicting opinions—to the extent they even contradict the treating opinions on those two specific issues—come from the state reviewing physicians, who opined Kilbane could perform light work. In reviewing the record, it is clear the ALJ erred in weighing the medical opinions. Due to the complex nature of Kilbane's ailments, I briefly outline her health issues in the months surrounding the alleged onset date.

Prior to May 2012, Kilbane worked for 20 years as an elementary school teacher. For the most part, Kilbane was in good health. In May 2012, however, that changed when several difficult-to-diagnose ailments resulted in several hospitalizations over the following three months. On May 10, 2012, a then 48 year old Kilbane was admitted to the hospital on the referral of her primary care physician following abnormal lab results. Tr. 244. Kilbane later learned she had acute renal failure. Kilbane also had pancytopenia (decreased platelets and red and white blood cells), a rash, and arthralgias. Tr. 244-45. Three days later, her condition improved enough for her to be discharged from the hospital.

One week later, Kilbane was readmitted with multisystem illness, leukocytoclastic vasculitis, arthralgias, pancytopenia, possibly cirrhotic appearing liver, dyspnea, and lower

extremity edema. Tr. 260. This hospitalization lasted eight days, upon which "she was felt to be

stable for discharge with outpatient evaluation." Tr. 262. As the doctors were still unsure of the

exact nature or severity of her illness, Kilbane "underwent [a] plethora of further testing . . . ."

Tr. 261. At this point, Kilbane reported pain and swelling in her hands, feet, and knees "to the

point where it was too painful to walk." Tr. 265.

One month later, Kilbane was hospitalized again, this time for three days. Tr. 291.

Doctors still lacked a firm diagnosis, noting only that it was "likely the diagnosis will be mixed

cryoglobulinemia vasculitis" and that it was unclear whether it and her "underlying liver disease"

were related. Tr. 292.

Upon discharge, Kilbane was referred to Dr. William Maier, a rheumatologist. Dr. Maier

first treated Kilbane on June 28, 2012, commented on the unclear etiology of Kilbane's

symptoms and noted that although Kilbane previously suffered arthralgias, she was not in pain

on that date. Tr. 292-93.  Near this time, Dr. Gregory Knecht, a gastroenterologist, noted

"Possible cirrhosis of the liver in the context of cryoglobulenemia and a systemic inflammatory

illness." Tr. 295. One month later, Dr. Knecht commented Kilbane was "much better than when I

saw her in the hospital" and "she is simply much better and pleased." Tr. 307. Kilbane's

improvement appears to be due to Dr. Maier's prescription of Rituxan for cryoglobulinemia

vasculitis ("CV").[2] Tr. 307-08. Kilbane at this point complained of mild tingling in her toes. Tr.

364.

One week later, on August 8, 2012, Kilbane established care with her primary care

physician, Dr. Molly Tveite. Tr. 344. By this time, doctors determined Kilbane suffered from,

amongst other ailments, CV, cirrhosis due to nonalcoholic steatohepatitis, and leukocytoclasic

---

[2] As noted in Kilbane's brief, cryoglobulinemia vasculitis is a thickening of blood and plasma due to abnormal immune proteins. Br., n.1. CV "causes pain and damage to the skin, joints, peripheral nerves, kidneys, and liver." *Id.* (quoting Nat'l Heart, Lunc, and Blood Inst.).

vasculitis. To say the least, Kilbane's condition remained serious. Although Kilbane was certainly better than when she was hospitalized, she was nowhere near back to full strength. Dr. Tveite noted Kilbane's energy level and strength "are not anywhere near baseline." Tr. 344. Kilbane also suffered from insomnia, possibly from medications, and anxiety, possibly from work stressors. Tr. 344. On physical examination, Kilbane's cheeks were "a little bit flushed."[3]

In mid-August 2012, Kilbane attempted to return to work. She had to move her classroom and testified she simply could not handle returning to work. Her attempt to work did not last long. On August 24, 2012, Kilbane again sought treatment from Dr. Tveite. As she recently attempted, without success, returning to work, it is understandable that Kilbane's chief complaint at this time was "situational anxiety and depression" regarding returning to work. Tr. 342. Adding to Kilbane's anxiety was her knowledge that if she could not return to work, she and her family would lose their health insurance. Tr. 360. Dr. Tveite noted Kilbane's CV was being managed by Dr. Maier, the specialist. Tr. 342.

Dr. Maier treated Kilbane on August 28, 2012, just days after her unsuccessful attempt at returning to her classroom. Kilbane complained of "increasing joint pain, peripheral edema and numbness, palpatations, and fatigue." Tr. 360. While Kilbane self-reported numbness, objective results demonstrated "some decreased light touch over her feet." Tr. 360. Taking everything into account, Dr. Maier provided the following assessment:

> Brooke is having persistent symptoms, which is making it very difficult for her to work. I agree with her that she is immunocompromised from her cirrhosis and

---

[3] In finding Kilbane less-than credible, the ALJ pounced on Kilbane's reported conflicts with her boss and her "flushed cheeks." The ALJ insinuated Kilbane quit due to that conflict rather than her symptoms, which the ALJ described simply as flushed cheeks. Tr. 18. Looking past all of the medical evidence from the three months immediately before Kilbane's alleged onset date, the ALJ found, "The claimant's alleged onset date and her explanation for her inability to work were not convincing." Tr. 18. These findings ignore Kilbane's complex symptomology and her recent life-threatening illnesses requiring multiple hospitalizations. As explained below, because the ALJ's error in weighing the medical opinions is dispositive, I need not discuss the ALJ's questionable credibility finding in detail.

medications, and I have recommended that she consider disability for at least a year of two while her disease is treated. She will investigate health insurance options during this period of disability. We will plan to re-assess in 2 weeks' time with updated laboratory at that time.

Tr. 360.

On August 30, 2012, Dr. Maier drafted the following note:

To Whom it may concern,

Ms. Brooke Kilbane is completely disabled until Oct 31, 2012 due to life threat[en]ing disease called cryoglobulinemia vasculitis and cirrhosis. She is receiving immune suppressive therapy that increases her risk for infection and cognitive dysfunction. She will be re evaluated at the end of Oct 2012.

Tr. 371.

Dr. Tveite treated Kilbane three times over the next three months. In September, Dr. Tveite noted Kilbane had cognitive dysfunction of some sort, but generally deferred to Dr. Maier's thought that this was caused by either the CV or the CV medication. Tr. 339-40. Dr. Maier noted Kilbane complained of some achiness and soreness, along with some dysesthesias in her feet. Tr. 358. Dr. Maier concluded Kilbane's CV was "currently stable" and noted Kilbane "is walking on a daily basis." Tr. 358.[4]

In October, Kilbane was off prednisone and appeared to be doing better. Tr. 337. Although she was doing better, Kilbane still suffered from insomnia and fatigue. Tr. 337. Dr. Maier noted that although Kilbane reported she was stable, she "still has a lot of dysesthesias in her hands and feet that worsen through the day. She has substantial fatigue." Tr. 358. Although Kilbane's CV continued to improve, Dr. Maier spent some of this appointment discussing "her disability secondary to her neurologic complaints and fatigue." Tr. 356. On October 31, 2012,

[4] The ALJ pointed to this note, that Kilbane walked daily, in finding Kilbane not credible. I agree with the ALJ that Dr. Maier had no reason to make this comment up and that it contrasts with Kilbane's testimony at the hearing. That Dr. Maier understood Kilbane was walking daily does not provide a legitimate reason to assign his medical opinion, based on his long-standing treating relationship with Kilbane, little weight. As noted, the outcome here rests solely on the medical opinions concluding Kilbane would need to rest or regularly elevate her feet and would miss numerous days of work each month on account of her ailments.

Dr. Maier wrote a letter stating, "To Whom it May Concern, Ms. Brooke Kilbane remains completely disabled from her autoimmune disease. Her period of disability will be approximately one year." Tr. 370.

In November 2012, Dr. Tveite again noted Kilbane continued to suffer from insomnia and "continues to feel fatigued and tired and drained." Tr. 335. Dr. Maier noted Kilbane's complaints of "persistent numbness and tingling in her toes and fingers." Tr. 354. Despite her complaints of tingling and numbness in her extremities, Kilbane's CV "seems to be under good control." Tr. 354. Understandably, Kilbane was anxious because she would lose her health insurance at the end of the month. Tr. 354.

In January 2013, Kilbane saw Dr. Maier again. She had lost 30 pounds, but "continues to have numbness and tingling in her hands and feet, worse with activity. Feet are improved with elevation." Tr. 352. Dr. Maier concluded that although her CV was stable, the numbness and tingling in her hands and feet "could be residual effects of the peripheral neuropathy associated with her vasculitis." Tr. 352. One month later, Kilbane again denied any join pain, but complained of "a lot of numbness and tingling in her hands and feet." Tr. 350. During this visit, Dr. Maier "discussed her symptoms of peripheral neuropathy and cognitive dysfunction which are quite disabling to her currently." Tr. 350.

Two months later, Dr. Maier noted Kilbane reported being "reasonably stable." Tr. 387. Kilbane still suffered from fatigue and cognitive difficulties. She denied any leg swelling or joint pain, but still had "some symptoms of peripheral neuropathy in her feet." Tr. 387. Once again, Dr. Maier noted Kilbane "seems to be stable." Tr. 387. The plan was for a follow up appointment in four months.

At the follow up appointment, Kilbane complained of "flu-like symptoms much of the time. She has chronic pain in her feet and legs whenever she stands for greater than an hour or does prolonged walking." Tr. 385. After a normal physical examination, Dr. Maier opined:

> Brooke's cryoglobulinemia and vasculitis seems to be in remission. Unfortunately, she has chronic extremity pain associated with previous vasculitic neuropathy. Her cirrhosis also is contributing to the fatigue. We discussed these issues in some detail. I do feel she is disabled from teaching due to her cognitive difficulties and her inability to stand for prolonged periods of time.

Tr. 385.

In January 2014, Dr. Maier filled out a medical evaluation form at the request of Kilbane's attorney. The form noted it would be used by the social security administration to determine how Kilbane could perform on a sustained basis in a work setting. Tr. 397. The form directed Dr. Maier to ensure any opinion on pain "should be consistent with your diagnoses and objective findings and how pain contributes to your patient's limitations." Tr. 397. In filling out the form, Dr. Maier noted Kilbane suffered from cryoglobulinemic vasculitis with painful peripheral neuropathy" and cirrhosis "with fatigue." Tr. 397. Dr. Maier concluded the "painful peripheral neuropathy and cirrhosis are irreversible" and would last longer than 12 months. Tr. 397. Dr. Maier noted Kilbane had abnormal sensory exams in lower extremities with symptoms of numbness, tingling, and pain in lower extremities, and fatigue from cirrhosis. Tr. 398. Dr. Maier believed "debilitating fatigue requiring frequent rest" required Kilbane to have to rest throughout the day. Tr. 398. Finally, Dr. Maier concluded Kilbane's impairments would result in her being unable to maintain a regular, 40 hour work week on more than four days each month. Tr. 399.

Dr. Maier's notes from Kilbane's January 2014 appointment show Kilbane had a normal examination but she complained of painful peripheral neuropathy. Dr. Maier concluded Kilbane

could have suffered "a flare" of her CV. Tr. 422. Three months later, Kilbane again had a normal examination, but still suffered from chronic pain from the neuropathy. Tr. 421.

In June 2014, Kilbane reported significant pain in her feet. Tr. 420. Dr. Maier noted her cirrhosis appeared to be stable. On examination, Dr. Maier noted Kilbane walked with a limp and had "decreased light touching in the stocking distribution of her feet." Tr. 420. In his assessment, Dr. Maier concluded "Brooke is disabled due to her cirrhosis, fatigue and peripheral neuropathy." Tr. 420. One month later, Dr. Maier saw Kilbane again. Kilbane reported unchanged symptoms, but "still suffers a good deal from her painful peripheral neuopathy." Tr. 418. Objective results showed Kilbane to have "decreased sensation to light touch over a stocking glove distribution of the feet." Tr. 418. Although Kilbane "appears to be reasonably stable," Dr. Maier noted she "still struggles with painful peripheral neuropathy." Tr. 418.

On August 21, 2014, Dr. Tveite saw Kilbane for the first time in one year due to the fact Kilbane lost her insurance. Tr. 444. Dr. Tveite noted Kilbane continued to see Dr. Maier during that time period. Dr. Tveite summarized Kilbane's history and provided notes of her subjective reports during this visit. Kilbane complained her peripheral neuropathy seemed most painful when she stood more than 10-15 minutes. Tr. 444. On examination, Dr. Tveite noted "A sensory deficit is present." Tr. 445. In the assessment, Dr. Tveite concluded Kilbane "still exhibits permanent neurologic damage related to past exacerbations." Tr. 445. Finally, Dr. Tveite noted Kilbane's cirrhosis appeared to be resolved, possibly benefited by Kilbane's better diet. Tr. 445.

That same day, Dr. Tveite drafted a letter stating:

> It is my medical opinion that Brooke Kilbane is disabled and unable to work due to permanent moderate cognitive impairment and irreversible peripheral neuropathy due to cryoglobulinemic vasculitis. She has not exhibited any improvement in these symptoms in the last two years and is unlikely to recover or improve.

Tr. 440.

On April 9, 2015, Dr. Tveite completed an evaluation form for Kilbane. Dr. Tveite noted that although she went a year without seeing Kilbane, Dr. Maier continued to treat Kilbane and forwarded progress notes on to Dr. Tveite. Tr. 464. Answering a question about Kilbane's ability to work considering her symptoms, Dr. Tveite commented, "The peripheral neuropathy causes limitations in ability to stand for even short periods of time. (> 15 mins.)." Tr. 466. In considering whether Kilbane's symptoms would cause her to miss work, Dr. Tveite concluded:

> It is difficult to predict how these impairments would affect her in a low stress, full time job. However, based on my interactions with Brooke and her past attempts to return to work – I suspect that the pain in her feet would require special accommodation – with frequent breaks, rest periods and light duty. I suspect that this may cause her to leave work early more than 1-2 x/week. She is also prone to severe unpredictable bouts of fatigue related to insomnia and cryoglobulinemia.

Tr. 466. Like Dr. Maier, Dr. Tveite concluded Kilbane's impairments would cause her to miss more than 4 days per month during a regular work schedule. Tr. 467.

The opinions of Drs. Tveite and Maier, formed by treating Kilbane's complex illness over the course of two years, are the only relevant treating or examining medical opinions in the record. Dr. Maier, who specializes in treating peripheral neuropathy and CV, treated Kilbane on more than ten occasions. Dr. Tveite treated Kilbane on just under ten occasions, spending many hours discussing symptoms with Kilbane. The ALJ gave both opinions little weight, opting instead to give great weight to the opinions of the reviewing physicians who never saw or examined Kilbane.

The ALJ is responsible for resolving conflicts in the medical record, including conflicts among physicians' opinions. *Carmickle v. Comm'r*, 533 F.3d 1155, 1164 (9th Cir. 2008). Generally, a treating doctor's opinion is entitled to more weight than an examining doctor's opinion, which in turn is entitled to more weight than a reviewing doctor's opinion. *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014). When a treating physician's opinion is contradicted

by another medical opinion, the ALJ may reject the opinion of a treating physician only by providing "specific and legitimate reasons supported by substantial evidence in the record." *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007).

As noted, the ALJ assigned little weight to the opinions of Drs. Tveite and Maier. Instead, the ALJ gave "significant weight" to the state agency reviewing doctors "because they were based on a review of all of the claimant's medical records available at the time for a comprehensive opinion of functioning." Tr. 21. The problem with the ALJ's reasoning is that nearly "all of the claimant's medical records" come from chart notes written by Drs. Tveite and Maier.

The opinions of treating source are generally entitled to controlling weight, as "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). This is especially true in Kilbane's case, where her ailments were less-than-crystal clear.

Generally, more weight is given "to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). Considering the length and nature of Dr. Maier's treating relationship with Kilbane, his opinions should have been given controlling weight on any questions regarding the extent of her limitations due to CV and peripheral neuropathy. 20 C.F.R. §§ 404.1527(2)(i), (ii).

Dr. Maier's opinions were backed, to the extent possible, by objective findings. On numerous occasions, Dr. Maier noted Kilbane had abnormal sensory exams in the lower extremities. Tr. 420, 398, 418. Dr. Maier was not alone in noting objective findings backed up Kilbane's complaints of painful peripheral neuropathy. Dr. Tveite also noted "A sensory deficit is present" upon examination. Tr. 445. In fact, Dr. Tveite concluded Kilbane "still exhibits permanent neurologic damage related to past exacerbations." Tr. 445.

On numerous occasions, over the course of several years, Drs. Tveite and Maier observed and examined Kilbane in a treatment setting, and listened to her relatively consistent claims of painful numbness and tingling in her lower extremities. Contrary to the ALJ's apparent conclusion, the extent of one's painful peripheral neuropathy is not something easily quantified. But there is a reason treating physician's opinions, both objective and subjective, are entitled to "special weight." *Rodriguez v. Bowen*, 876 F.2d 759, 761 (9th Cir. 1989). (quoting *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1989)). Treating physicians are in the best position "to know and observe the patient as an individual." *Id.* (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).

The ALJ rejected Dr. Maier's opinion in part by concluding the opinion was an opinion on the ultimate issue of disability, which is a decision reserved for the commissioner. Tr. 21. While that may be true for Dr. Maier's opinion that Kilbane was "disabled" or "disabled from teaching," Dr. Maier also offered more specific opinions on Kilbane's functional limitations. As relevant here, Dr. Maier concluded Kilbane suffered from "debilitating fatigue requiring frequent rest." Tr. 398. Dr. Maier described Kilbane's symptoms as "Numbness, tingling and pain of lower extremities. Fatigue from cirrhosis." Tr. 398. Due to her numbness, pain, and fatigue, Dr. Maier concluded Kilbane would miss more than 4 days of work each month. Tr. 399. Dr. Maier

believed Kilbane lacked the ability to "stand for prolonged periods of time." Tr. 385. Dr. Maier's opinions align with those of Dr. Tveite, who concluded Kilbaine's "peripheral neuropathy causes limitations in ability to stand for even short periods of time (> 15 mins)." Tr. 466. Dr. Tveite believed pain in Kilbane's feet would likely cause her to leave work early once or twice each week, and Kilbane's impairments would result in her missing more than 4 days of work each month. Tr. 466-67. Contrary to the ALJ's conclusion, when read in conjunction with the extensive chart notes, the only treating opinions in the record are not "vague."

The ALJ pointed to the alleged contrast between Dr. Maier's opinion and chart notes that Kilbane, at various times, was doing "quite well." As demonstrated by the outline of Kilbane's condition and treating history above, the ALJ's conclusion misstates the record and ignores the seriousness of Kilbane's condition. In the summer of 2012, Kilbane's condition was "life threatening." Tr. 368. That her condition improved enough to be discharged from the hospital is neither here nor there. That her CV eventually stabilized did not mean she was cured. The chart notes reveal that over the course of several years, her treating physicians believed Kilbane suffered from painful peripheral neuropathy. Despite the fact Kilbane improved following numerous hospital stays, she still had a complex "life threatening disease," with complex symptoms requiring ongoing treatment from a specialist over the course of two years.

The ALJ erred in elevating the opinions of the reviewing physicians over those of Kilbane's treating physicians. The opinions of Drs. Tveite and Maier are entitled to great weight.

As the ALJ erred, the question is whether to remand for further administrative proceedings or an award of benefits. The Ninth Circuit recently clarified the "credit-as-true rule." *See Garrison v. Colvin*, 759 F.3d 995, 1019-23 (9th Cir. 2014). When additional proceedings can

remedy any errors by the ALJ, the case should be remanded. *Id.* at 1019. However, remand for calculation of benefits is appropriate when:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Id.*at 1020.

All three requirements are met in this instance. The record is fully developed. The ALJ erred in assigning little weight to the only treating opinions in the record. Credited as true, those opinions, along with the VE's testimony, establish that Kilbane is disabled under the act.

The VE testified that more than one day of unscheduled absence per month is generally not acceptable by the employer. Tr. 61, 65. If an employee had to lie down at unpredictable times, the employee would be let go. Tr. 63. If an employee had to elevate her legs one or two feet (or higher) for an hour or so each shift, at unpredictable intervals, the employee would not be able to maintain competitive employment. Tr. 63-64. Because Kilbane would miss more than four days of work each month and would need to frequently rest her legs throughout the day, Kilbane is disabled under the act.

## <u>CONCLUSION</u>

The opinions of Kilbane's treating medical physicians, along with the testimony of the VE, demonstrate Kilbane is disabled under the act. The Commissioner's final decision is therefore REVERSED and this matter is REMANDED for an award of benefits.

IT IS SO ORDERED.

DATED this 7th day of September, 2017.

_____/s/ Michael J. McShane _____
Michael McShane
United States District Judge